2022 IL App (1st) 200467

FIRST DISTRICT
SIXTH DIVISION
June 24, 2022

No. 1-20-0467

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 13942 |
| | ) | |
| DOUGLAS DAVIS, | ) | Honorable |
| | ) | Geraldine D'Souza, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Mikva and Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1       Following a jury trial, defendant Douglas Davis was convicted of aggravated kidnapping and vehicular hijacking and sentenced to concurrent prison terms of 30 and 15 years. We dismissed his direct appeal for want of jurisdiction. *People v. Davis*, No. 1-09-3429 (2011) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Defendant now appeals from the dismissal of his postconviction petition, contending that postconviction counsel failed to provide reasonable assistance by not amending the petition to allege ineffective assistance of appellate counsel to avoid forfeiture of defendant's other postconviction claims. Alternatively, defendant contends that he made a substantial showing of trial counsel's ineffectiveness for not using a peremptory strike against a biased juror. For the reasons stated below, we vacate the dismissal of defendant's petition and remand for further proceedings on the petition's claim that trial counsel rendered ineffective assistance by not filing a notice of appeal from defendant's conviction.

¶ 2                                    I. JURISDICTION

¶ 3      Upon the State's motion, the circuit court dismissed defendant's April 2011 postconviction petition, as amended in March 2017, on February 7, 2020. Defendant filed his notice of appeal on February 21, 2020. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017), governing appeals from a final judgment in a postconviction proceeding.

¶ 4                                    II. BACKGROUND

¶ 5      Defendant and codefendant Rita Caradine were charged with aggravated kidnapping and vehicular hijacking of Cathie Threat on or about May 17, 2005. The two aggravated kidnapping counts alleged that defendants secretly confined Threat and carried her from one place to another, respectively, and committed vehicular hijacking against her. The vehicular hijacking count alleged that defendants took a 2005 Saturn vehicle from Threat by force or threat of imminent use of force. The aggravated kidnapping counts originally also alleged that defendants inflicted great bodily harm, but the State amended the charges shortly before trial in March 2008 to omit that allegation.

¶ 6      In June 2005, counsel was appointed for defendant, who was admonished that he could be tried *in absentia* if he was released on bond but did not appear in court. The court explained that his failure to attend a trial *in absentia* would forfeit his rights to be present in court, confront and cross-examine witnesses, and testify on his own behalf. Defendant was also warned that the State would be able to participate in jury selection and present witnesses and other evidence against him and, if he was convicted, he would be sentenced *in absentia*.

¶ 7      In January 2006, the defense requested a trial date of April 4, 2006. However, on April 3, counsel asked for a continuance to review discovery material from the State. In May 2006, the

court set a trial date of July 10, 2006. However, in June 2006, counsel agreed to a continuance to later that month so she could subpoena some of Threat's medical records. At that time, trial was set for August 2, 2006. It was continued by agreement in July 2006 to September 26, 2006.

¶ 8    On September 26, 2006, with defendant still in custody and having unsuccessfully moved for bond reduction in August 2006, counsel informed the court that she recently received in discovery a copy of defendant's written postarrest statement. She therefore filed that day a motion to suppress defendant's postarrest statements. The motion alleged that defendant was not first given *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)); was unable to understand *Miranda* warnings "due to [his] physical, physiological, mental, educational, emotional and/or psychological state, capacity and condition"; was questioned after exercising his rights to remain silent and have an attorney present; and that his statements resulted from "psychological and mental coercion," being confronted with illegally-obtained evidence, and being confronted with material misrepresentations.

¶ 9    The case was continued from time to time for the motion to suppress.

¶ 10    In December 2006, private counsel appeared for defendant, and appointed counsel was allowed to withdraw. In reminding previous counsel to provide records to new counsel, the court mentioned the motion to suppress. Defendant told the court or its clerk that he had posted bond.

¶ 11    In March 2007, the court set a trial date of May 3, 2007, at defense behest. The motion to suppress was not mentioned.

¶ 12                                A. Trial *In Absentia*

¶ 13    However, on May 3, 2007, defendant did not attend court. Counsel told the court he had been in contact with defendant and had no explanation for his absence. The State noted that it was

ready for trial and had its witnesses in court. The court issued a warrant for defendant's arrest. The court and parties discussed the prospect of a trial *in absentia*, and counsel noted that defendant had not waived a jury trial. The case was continued to allow time for defendant to appear.

¶ 14 All continuances from defendant's plea and the appointment of counsel in June 2005 until the March 2008 trial were either by agreement or upon defense motion.

¶ 15 During motions *in limine*, the defense sought an order to redact from any testimony regarding defendant's postarrest statement and bar the parties from mentioning defendant's reference to his murder conviction and 10-year prison sentence. At the March 2008 motion hearing, the motion was granted without objection.

¶ 16 The defense also sought an order that the State not refer before the jury to defendant's absence from the trial; that is, only the court would refer to his absence and instruct the jury that no inference should be made from that absence. Conversely, the State filed a motion seeking in relevant part to be allowed to refer to defendant's absence as evidence of consciousness of guilt.

¶ 17 At the hearing *in limine*, the State claimed that (1) defendant was admonished in 2005 regarding trial *in absentia*, (2) on May 3, 2007, the parties were ready for trial and defendant was in court when it recessed but was not there when court reconvened, and (3) since then, two certified letters were sent to defendant's last known address. The defense argued that defendant had been in court for continuances of the trial date before his absence; that he did not appear in court on May 3, 2007, but then leave as the State claimed; and that State argument based on his absence would be more prejudicial than probative. The State argued that a defendant does not have the right to not appear at trial so the State can properly comment on a defendant's absence as flight and evidence of consciousness of guilt.

¶ 18 The court found for purposes of holding a trial *in absentia* that defendant willfully avoided or absented himself from trial. On the motions *in limine*, the court granted the State's motion and denied the defense motion, finding that case law supported that the State could argue consciousness of guilt. The court remarked that it would not allow evidence that defendant attended court on prior occasions "because I wouldn't let either of you bring it up."

¶ 19 During the hearing *in limine*, the State also amended the indictment as mentioned above (*supra* ¶ 5) without objection. The defense noted that the amendments made "both of the elements of the offense mutually exclusive." In other words, to find defendant guilty of aggravated kidnapping, the jury would also have to find him guilty of vehicular hijacking.

¶ 20 Also, the defense withdrew the motion to suppress. The court asked previous (that is, appointed) counsel about her grounds for claiming in the motion that defendant was unable to understand *Miranda* warnings. Previous counsel admitted that this claim was "boilerplate" not supported by any particular knowledge that defendant "was suffering any psychological or mental infirmities." Present (that is, private) counsel told the court that, after discussing the motion to quash with defendant and previous counsel, he decided to not suppress defendant's statement because he wanted defendant's initial statements to be in evidence. He opined that defendant had no apparent mental infirmities or defects when he interviewed defendant.

¶ 21                                    B. Jury Selection

¶ 22 During jury selection, the court noted that each party would have seven peremptory strikes. After the court examined several venire members, 10 jurors had been selected, and the defense had used six peremptory strikes when the court examined Bernadette Skinner.

¶ 23    Skinner testified, after answering several biographical questions, that she had served on a jury in a civil trial that went to verdict. She agreed that she would put that experience out of her mind and consider only the instant case on the facts she determined at trial and the law from the trial court herein rather than any law she was instructed upon in that case. A relative had been the victim of an armed robbery over a decade earlier, where nobody was harmed and nobody was caught, and she denied the incident would interfere with her ability to be fair and impartial in this case. A friend had suffered a home invasion, also years earlier with nobody caught, and she again denied that it would affect her ability to be fair and impartial. She had been a party to "many" lawsuits over a family inheritance that were "dropped." An uncle had been arrested on federal drug charges in the 1960s, but nothing about that would affect her ability to be fair and impartial here.

¶ 24    Skinner denied that anything about the charges here would impact her ability to be fair and impartial. She acknowledged that being fair and impartial meant she would return a guilty verdict if the State proved its case beyond a reasonable doubt and a not-guilty verdict if it did not, and she would be able to do both. She acknowledged that serving as a juror meant determining the facts of the case based on the trial evidence and the law as instructed, even if she disagreed with that law, and she would be able to do that. Nothing about her health would affect her service as a juror in a short trial, and she had no religious or other qualms about judging another person.

¶ 25    Skinner knew the police chief and some officers in her community as acquaintances and denied that would affect her ability to be fair and impartial. When asked if would give more or less weight to police testimony than other testimony, she replied "The respect that I have for the police officers, I don't know if I could answer that honestly." The court urged her to answer the question honestly and reminded her that all witnesses swear to tell the truth and she would determine witness

credibility if she was a juror. The court again asked her if she would give a police officer's testimony more weight because he was an officer, and she replied that she would. When the court asked her if she would believe police testimony "over anybody and not evaluate them the same as anybody," she replied that she "would be as fair as I could be." Skinner accepted that the defendant is presumed innocent, the State must prove him guilty beyond a reasonable doubt, he need not present any evidence, and it cannot be held against him if he did not testify.

¶ 26    The defense moved to strike Skinner for cause, arguing that she admitted she could not be impartial then retracted it under repeated questioning but "I don't believe that changed what is in her heart" but only her replies to the court's questions. The court denied a strike for cause, noting her reply that she could be fair. The court reminded counsel that he had one peremptory challenge left, and counsel expressly declined to exercise it. The two remaining jurors, including Skinner, and two alternates were selected and sworn without the defense using its last peremptory challenge.

¶ 27                                    C. Trial Evidence

¶ 28                                    1. Threat

¶ 29    At trial, Threat testified that she lived in a certain apartment complex in May 2005. At that time, she was the assistant manager of a store and handled payments to the store in cash as well as by credit. On May 17, 2005, she closed the store and went home at about 10:30 p.m. in her Saturn sport utility vehicle (SUV) with a manual transmission. When she parked in her complex parking lot, it was lit and nearly full, so she parked in the only remaining open space. As she backed into that space, she noticed a van in the next space with its engine running. At trial, she identified photographs of her SUV and the van. She reached into the back seat of her SUV for her bag, and the van's side door opened. Two men came out of the van and grabbed her, one from behind and

the other in front of her. She screamed and struggled with them to keep them from putting her into the van. At some point in the struggle, she dropped her car keys. Neither man was wearing a mask, and she could see the face of the man in front of her. At trial, Threat identified a photograph of defendant as the man who was in front of her trying to force her into the van. She was certain it was him. Defendant pushed her into the van, "onto the floor," and she was unable to escape. He tied her hands with what felt like wire and put a blanket or other cover over her head.

¶ 30    She could not see at first, but she continued struggling and saw a woman in the driver's seat of the van. Defendant was still holding her down on the floor of the van when she felt the van moving. They drove a short while before the van stopped suddenly, and defendant untied her hands and stopped holding her down. The side door of the van opened, and she scrambled out. She could not recall if she opened the door. She was distraught and hysterical during the incident because she did not know what they intended to do, and she focused on getting out of the van. When she got out of the van, she saw two police officers, and she sat down on the ground in relief. She saw the officers pull defendant from the front passenger seat of the van. At trial, she identified her shoes in a photograph of the van's interior. She presumed they came off her feet in the struggle. Threat never saw either man from the incident before that night. She spoke with police later that night, and she later went to the police station to retrieve her SUV.

¶ 31    On cross-examination, Threat testified that she had bruises but no permanent injuries from the incident. She had not seen defendant in her store, and she did not know whether he knew she handled the store's cash. When she glanced at the van just before the incident, she saw someone in the driver's seat but could not describe him or her. She did not know how many people were in the van before the men grabbed her. When asked if one of the men approached her from behind

and somehow ended up in front of her, she explained that the van door was right by the rear door of her SUV so when the men exited the van, one exited in front of her and the other exited behind her. She denied that there was a hand covering her face. She saw defendant before she was pushed into the van and while inside the van, as he was tying her hands before covering her head. Her feet were not tied, and she never told the police that they had been tied. She was unable to describe the man who was behind her and did not see where he went. She did not describe defendant to police because he was in the van when they arrived. She did not know if anyone left the van before the police stopped it nor how many people took her SUV. She was not shown a photographic array or lineup but was shown two photographs, from which she could not make an identification.

¶ 32    On redirect examination, Threat clarified that her struggle with the men lasted for more than two seconds. She did not need a photographic array or lineup to make an identification of defendant. She wanted the actual perpetrators to be punished and was not identifying "just anybody." On recross examination, she testified that police did not tell her that one of the perpetrators from the van avoided capture.

¶ 33                                    2. Eyewitnesses

¶ 34    Kenya Washington testified that she was living in a certain apartment complex on May 17, 2005, with the parking lot behind the building. She was in a bedroom with the window open when she heard a muffled scream outside. She went to the window and saw a man pulling a woman into a dark burgundy or brown van in the parking lot while holding a hand over her mouth. The lighting in the lot was "adequate" for her to see. She did not recognize the man but recognized the woman as another resident of the complex. She was kicking and trying to scream, and Washington saw her legs dangling from the van before it slowly drove away. Washington then saw a man and

woman come from the direction of the van to a car with its door open and alarm sounding, with "things scattered on the ground." The man picked up the items on the ground, put them in the car, and drove away in the car in the same direction as the van. As all this was happening, Washington had her husband bring her a telephone, and she called the police. She described the incident, including that she believed it to be a kidnapping. Police arrived while she was still on the telephone. Washington was shown photographs of the van and the woman's car and recognized them as such.

¶ 35    On cross-examination, Washington testified that the woman was grabbed from behind and dragged backwards into the van, and she did not see the woman face her attackers. She was not certain whether the man who put items in the victim's car and drove it away was alone, nor did she know for certain that he came from the van. Washington spoke with police "after everybody was arrested." She could not recognize a photograph of defendant in court, testified that she never saw him before, and testified that neither the man who pulled the woman into the van nor the man who took her car resembled defendant.

¶ 36    Richard Jones testified that he was living in a certain apartment complex on May 17, 2005. When he came home, he saw an unfamiliar brown van in the parking lot. At about 10:45 p.m., he heard a scream and a car alarm and looked out from his third-floor apartment into the lit parking lot. There, he saw a silver SUV with a bag hanging from its open rear door but nobody nearby. He recognized the SUV as belonging to another resident of the complex. He stepped away from the window. Later, when he heard the SUV's engine start and then stall, "like if you have a stick shift," he called the police and went outside where he saw the SUV driving away slowly. Jones followed the SUV in his own vehicle. After he saw the brown van stopped by police, the SUV stopped and

someone ran from it. Jones did not follow that person and could not describe the person. Jones then spoke with police. At trial, he identified photographs of the van and the SUV.

¶ 37 On cross-examination, Jones testified that he was not initially alarmed by or suspicious of the brown van in the parking lot, but he noticed it because there were people inside. He could not see whether there was a second person in the SUV he followed. Because of the windows in the apartment building, he could see the SUV as he went downstairs. However, he did not see the SUV constantly, and a second person could have fled the SUV when he was not looking. He did not notice the brown van between when he arrived home and when he saw it stopped by police. He did not see the van near the SUV when he looked out after the scream and car alarm, did not see the SUV follow the van, and did not see the van nearby when the SUV drove away. At trial, he did not recognize a photograph of defendant.

¶ 38                                3. Police Response

¶ 39 Sergeant Bernard Begeske testified that he responded at about 10:48 p.m. to a report of a woman being forced into a van at a certain location. As he was a few blocks from the location, he saw a brown van, being driven by a woman, that fit the description of the van in question. He followed the van, stopping it once another officer joined him. Sergeant Begeske was approaching the van from the driver's side as the other officer approached the van's male passenger and told him to exit the van. A woman then stumbled or rolled from the passenger side of the van. She seemed hysterical or distraught, and she ran towards the other officer. The male passenger exited the van, and he was defendant. The woman who had been driving the van also exited, and she was codefendant. When defendant was asked for identification, he showed his driver's license. Defendant and codefendant were taken into custody. Among various photographs of the van that

Sergeant Begeske identified was one depicting a bed covering or quilt "that also came out when she exited the van" by tumbling out.

¶ 40 On cross-examination, Sergeant Begeske testified that the report was of two men forcing a woman into a van, but it contained only one man when it was stopped. He saw no movement in the van until the woman tumbled out. He did not know how she opened the van door. After she stumbled out, she ran to the curb, and he did not see her hands or feet tied. As he approached the driver's side of the van, he could not see into the van except to see the driver. When defendant exited the van, Sergeant Begeske did not look particularly to see if he had wounds or marks from someone defending themselves but did not notice anything unusual about his appearance.

¶ 41 On redirect examination, Sergeant Begeske reiterated that defendant exited the passenger side of the van after the hysterical woman tumbled out of the van. As he could not see into the van beyond the driver, he did not see whatever happened in the van before the woman fell out.

¶ 42                                  4. Defendant's Statement

¶ 43 Detective George Barich testified that he was investigating an aggravated kidnapping that occurred on May 17, 2005, when he and another detective interviewed defendant at a police station on May 18. They first had him read aloud the *Miranda* warnings from a form and then initial and sign the form, which Detective Barich and the other detective countersigned. However, the interview lasted only a few minutes. Detective Barich and another detective interviewed defendant the next day, May 19. Defendant admitted his involvement in the kidnapping, in an interview that lasted about 10 minutes. Detective Barich made no threats or promises, and defendant did not appear to be under the influence of drugs or alcohol.

¶ 44    Specifically, defendant owed $4500 to a friend he knew only as Chinaman (we shall refer to him henceforth as C), who told him that the debt would be considered paid if he helped C with a kidnapping. Defendant, codefendant (who was defendant's girlfriend), and C then went in C's van to Threat's apartment building, where they waited in the parking lot for Threat to arrive. Threat parked her silver SUV next to C's van. When she exited her SUV and walked to its rear, C exited his van and tried to pull Threat into it. When Threat yelled and struggled, defendant grabbed both C and Threat and pulled them into the van. C then went to Threat's SUV to drive it away while codefendant drove away C's van. "A few seconds later," they were stopped by police and arrested.

¶ 45    On cross-examination, Detective Barich testified that defendant said in the first interview on May 18 that he was merely a passenger in the van and had no knowledge of the kidnapping. Also on May 18, the police were unsuccessfully seeking C. C was mentioned in the interview of May 19, and only defendant and codefendant were in custody. Detective Barich had not questioned codefendant when he questioned defendant. Defendant's statement was not taken by stenography or videorecording, nor was he given an opportunity to write his own statement. Instead, Detective Barich wrote a summary of defendant's account from the second interview. Defendant made no corrections to, nor did he sign or otherwise approve, the statement Detective Barich prepared. Detective Barich did not prepare a similar statement or summary of the first interview where defendant denied involvement. After defendant's second interview, two assistant state's attorneys (ASAs) interviewed him in Detective Barich's presence and gave him the opportunity to write his own statement or one of the ASAs would write it. Defendant did not write his own statement. Indeed, after defendant admitted his involvement in the kidnapping to the ASAs and one of them started to write a statement, defendant demanded that the process stop, and it did.

¶ 46    When asked about Threat's legs being tied during the kidnapping, Detective Barich replied that he was not at the scene and that he read in a report that her legs were tied. As he recalled, "there was an attempt made to tie her legs, and *** if they were tied, that just meant she got loose." When asked if he recalled grand jury testimony that Threat was found in the van with her legs tied, Detective Barich replied that he recalled testifying before the grand jury and that he based his testimony on Threat's account that her legs were tied.

¶ 47    On redirect examination, Detective Barich testified that he asked defendant at the beginning of the second interview about codefendant's involvement, and he said that she was "along for the ride" and unaware of the kidnapping plan. She was pregnant with defendant's child at the time. Defendant then gave his account of being involved in the kidnapping. When the ASAs interviewed defendant, they first read him a notice of his *Miranda* rights that he signed and the ASAs and Detective Barich countersigned. Defendant then spoke with the ASAs When given the choice to write his own statement or have an ASA write it, defendant expressly chose the latter. While defendant ended the interview, he never said that "what was going on was not right."

¶ 48    Detective Barich read into the record defendant's statement to the ASAs. After giving personal information and acknowledging that the ASAs were not his attorneys and they read him his rights, defendant gave an account: he was with codefendant on the evening of May 17, 2005, when C came to them, after asking defendant earlier by telephone if he had a driver. Attached to the statement was a photograph of Charles Estell, whom defendant had identified as C. Defendant and codefendant left in C's van, and defendant told C that codefendant would be the driver. Defendant then ended the interview.

¶ 49    On recross examination, Detective Barich acknowledged that defendant did not sign, initial, or correct the statement prepared by the ASA. The statement made no reference to abduction and did not name a victim, and it was when questioning went in that direction that defendant ended the interview.

¶ 50                                5. Defendant's Absence

¶ 51    A court clerk testified that defendant's case was scheduled in March 2007 for trial on May 3, 2007, but defendant was not in court that day and a warrant was issued for his arrest. (The defense objected to this evidence as more prejudicial than probative, as the court had already made the requisite finding for a trial *in absentia*, but the State argued that it was evidence of consciousness of guilt, and the court overruled the objection.) Defendant was in court in March 2007 when the May 2007 trial date was set. The clerk's office sent two notices to defendant's last known addresses in Illinois and Ohio by certified mail.

¶ 52    An investigator for the state's attorney testified that she checked the computerized records of persons in custody in Illinois, surrounding states, and Ohio and did not find defendant therein.

¶ 53                                      6. Verdict

¶ 54    The defense made a motion for a directed verdict, arguing that the State failed to prove vehicular hijacking based on defendant's accountability for C's actions in taking the SUV when the kidnapping was complete. He also argued that the aggravation for aggravated kidnapping was the hijacking so that aggravated kidnapping was also not proven. The State noted that defendant admitted that he agreed with C to commit kidnapping and argued that the hijacking occurred in the course of the kidnapping in that C could take the SUV because Threat had been kidnapped. In other words, the State argued, it did not merely happen that C took the SUV just after Threat was

kidnapped but it was part of C's plan in which defendant participated. The State argued that the SUV was taken from Threat's presence and that the kidnapping was not over until she was free.

¶ 55    The court noted that, unlike an armed robbery that is complete when the property is taken, kidnapping is ongoing as long as the victim is secretly confined. The defense argued that the kidnapping was complete for accountability purposes; that is, that defendant was not accountable for C's actions after defendant left the parking lot. Reiterating its argument that the hijacking was part of a common design with the kidnapping, the State argued that the jury should be able to decide whether the evidence supported that argument.

¶ 56    The court denied the directed verdict motion, finding that the evidence supported a conclusion that kidnapping was not complete but ongoing when defendant left the parking lot. As to the hijacking, the court found that the evidence supported a conclusion that force was used to remove Threat from the immediate presence of her SUV with intent to take the SUV.

¶ 57    During the jury instruction conference, the defense expressly chose, as part of an "all or nothing" strategy, not to seek instructions on the lesser included offense of kidnapping.

¶ 58    Following closing arguments and instruction, the jury found defendant guilty of two counts of aggravated kidnapping and one count of vehicular hijacking.

¶ 59                              D. Posttrial Proceedings

¶ 60    The posttrial motion challenged the sufficiency of the evidence, including the evidence of defendant's accountability for the acts of codefendant and C on the hijacking charge. The motion also challenged the State's references in argument to defendant's absence, including arguing his absence as evidence of consciousness of guilt. The motion challenged the denial of the defense

motion for a directed verdict, including arguing that the court should have found defendant guilty of kidnapping rather than aggravated kidnapping. The motion was denied after brief argument.

¶ 61     At sentencing in April 2008, the court merged the two counts of aggravated kidnapping and sentenced defendant to concurrent prison terms of 30 years for aggravated kidnapping and 15 years for vehicular hijacking.

¶ 62     In March 2009, following defendant's November 2008 arrest, he filed a *pro se* motion for a new trial and sentencing hearing, claiming that his absence from court was not his fault and "due to circumstances beyond his control." Defendant simultaneously filed a *pro se* notice of appeal, citing the statute on trials *in absentia* (725 ILCS 5/115-4.1 (West 2018)) but referencing his conviction and sentencing.

¶ 63     After said motion and notice of appeal were filed, the court remarked that a notice of appeal could proceed without its action while the motion would require its decision. The court appointed counsel to represent defendant and asked her to "figure out which way you are going about it." Counsel noted that no notice of appeal had been filed after defendant was sentenced, and the court stated that the *pro se* March 2009 notice of appeal was likely untimely filed.

¶ 64     Counsel reviewed the *pro se* motion and told the court "I did not see any issues [to] get around the untimeliness of this filing" as a posttrial motion but was considering postconviction proceedings. The court expressed concerns about recharacterizing a posttrial motion with no constitutional claims as a postconviction petition and about appointing the public defender to prepare and file an initial (rather than supplemental or amended) postconviction petition.

¶ 65     In October 2009, counsel told the court that she spoke with defendant and he was withdrawing his motion. The court acknowledged withdrawal of the motion and granted defendant

copies of his transcripts so he could prepare a postconviction petition. A *pro se* notice of appeal followed in November 2009.

¶ 66                                          E. Direct Appeal

¶ 67    On direct appeal, counsel appointed for defendant filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing that this court lacked jurisdiction over a direct appeal. *Davis*, slip order at 1-2. Defendant responded, "arguing the merits of his contentions" but not addressing jurisdiction. *Id.* at 2. This court agreed with counsel, finding that the November 2009 notice of appeal was untimely filed in light of the April 2008 sentencing, and therefore granted counsel's motion to withdraw and dismissed the appeal for lack of jurisdiction. *Id.*

¶ 68                                    F. Postconviction Proceedings

¶ 69    Defendant filed his *pro se* postconviction petition in April 2011. The petition claimed that the State knowingly used false testimony both to obtain the indictment and at trial.

¶ 70    A copy of the grand jury transcript was attached to his petition, in which Detective Barich testified that he was assigned to investigate the kidnapping and hijacking of Threat on May 17, 2005. He learned that Threat was parking her 2005 Saturn behind her apartment building on that day when she noticed a van parked next to her and then defendant and another man grabbed her as she exited her car and forced her into the van. Threat tried to break free, but a blanket was thrown over her head and she was placed on the floor of the van with her legs tied. Codefendant was driving the van, and the man entered the Saturn and drove it away. Two witnesses saw the incident and reported it to police, who stopped a van fitting the witness description. Defendants were inside the van, and Threat fled the stopped van. Detective Barich testified that Threat never gave

defendant or codefendant permission to take her car. On this evidence, the grand jury indicted defendants.

¶ 71    The petition also claimed that trial counsel was ineffective for (1) not investigating and filing a motion to dismiss the indictment based on false testimony, (2) not making a speedy trial demand, (3) withdrawing rather than proceeding upon a motion to suppress, (4) not properly cross-examining witnesses to cast doubt on defendant's guilt of aggravated kidnapping based on hijacking, and (5) not timely filing a notice of appeal after his conviction.

¶ 72    Attached to the petition was a document styled as defendant's affidavit, signed by him but not notarized. In support of the speedy trial claim, defendant averred that he repeatedly told trial counsel to invoke his right to a speedy trial, though he admitted "I didn't fully understand how such rights were to be [i]nvoked and what constituted such," he reached the conclusion counsel was not protecting his rights after discussing his case with other inmates, and counsel advised him to follow the advice of counsel rather than inmates. In support of the motion to suppress claim, defendant averred that neither his appointed nor private trial counsel discussed with him his statements to police and thus were unaware of his claims of threats and coercion. In support of the notice of appeal claim, defendant averred that he discussed his case with counsel before trial, including the prospect of and procedure for appealing, and he told counsel in no uncertain terms to file a notice of appeal if he was convicted.

¶ 73    Also attached to the petition was a copy of defendant's partial statement of May 19, 2005, to the ASAs. The statement was consistent with Detective Barich's testimony regarding it (*supra* ¶ 48) except that the final portion of the statement before defendant ended the interview, in which defendant described telling C that codefendant would be the driver, was crossed out.

¶ 74    The petition also alleged that the trial court deprived defendant of the opportunity to show that he had attended court expecting trial to rebut the State's consciousness-of-guilt argument. Defendant claimed that the evidence of his guilt of vehicular hijacking by accountability was insufficient, the evidence of his guilt of aggravated kidnapping based on hijacking was also insufficient, and the court erred in denying the posttrial motion to that effect. The petition alleged that the court denied a defense motion to strike Skinner from the jury for cause but trial counsel then did not use a peremptory strike against Skinner, so that defendant was deprived of a fair trial and trial counsel rendered ineffective assistance. Defendant claimed in the petition that he was deprived of due process and a fair trial by the cumulative effect of these errors.

¶ 75    Anticipating State arguments of waiver and forfeiture, defendant alleged in an attachment to the petition that trial counsel failed to preserve his right to a direct appeal, trial counsel was ineffective for not making all objections and raising all posttrial claims necessary to preserve the issues in the petition, and appellate counsel failed to raise the issues in the petition.

¶ 76    Counsel was appointed on defendant's petition in 2011. In October 2015, counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) that he communicated with defendant by mail and telephone "regarding his claims of deprivation of his constitutional rights," reviewed the record including transcripts, read the *pro se* petition, investigated defendant's claims, "believe[d] they raise a substantial legal question regarding a deprivation of his constitutional rights," and would not be supplementing the petition.

¶ 77    In March 2017, counsel filed another Rule 651(c) certificate substantially identical to his earlier certificate except for adding that "a complete amended *pro se* petition is attached." The amended petition was substantially identical to the initial petition with the addition of (1) a claim

that defendant's sentence for vehicular hijacking was erroneous because that offense was the predicate or aggravating offense in the aggravated kidnapping charges so that vehicular hijacking merged into aggravated kidnapping and (2) additional argument that the evidence of defendant's guilt of vehicular hijacking on an accountability basis was insufficient so that the aggravated kidnapping conviction should also be vacated. The amended petition had the same attachments as the initial petition, including defendant's non-notarized "affidavit" and the allegations countering forfeiture that trial counsel failed to file a notice of appeal and trial and appellate counsel failed to raise all claims in the petition.

¶ 78    In June 2017, the State filed a motion to dismiss the petition as amended. It argued that the claims of perjury or false testimony were meritless, noting that defendant had to show that State use of false testimony was knowing and had a reasonable likelihood of affecting the outcome, arguing that the trial testimony was on the record and thus should have been addressed on direct appeal, and arguing that mere inconsistencies in testimony do not prove perjury. It argued that defendant's claim that counsel was ineffective for not investigating and calling witnesses had to be supported by affidavits but was not. The State also argued that there were no inconsistencies between Detective Barich's grand jury and trial testimony so the claim that he perjured himself was unsupported. As to the speedy-trial clam, the State argued that no trial demand was made, all continuances before trial were by agreement, and continuances were duly explained by discovery matters and case conferences.

¶ 79    Regarding a motion to suppress, the State's motion to dismiss noted that the circumstances of defendant's statement were examined at trial and argued that defendant's affidavit to threats and coercion was not notarized and should not be considered. The State argued that the appellate

court can vacate the appeal of a fugitive so filing a notice of appeal would have been pointless. As to the juror issue, the State argued that not using a peremptory challenge is a matter of trial strategy, the claim was forfeited as it was on the record, and defendant could not show that he was prejudiced. Indeed, the State argued, defendant could not show prejudice for any of his ineffective assistance claims. As to the claim that the court deprived defendant of the opportunity to argue that he was present in court on earlier occasions when trial was scheduled, the State argued that the matter was properly disposed of on a defense motion *in limine*. The State argued that the sentencing and insufficiency claims were apparent on the record and appropriate for direct appeal so that they were forfeited. Lastly, meritless claims of error could not have a cumulative effect.

¶ 80      On February 7, 2020, the court heard the State's motion to dismiss. The State declined to make initial argument on its motion. Postconviction counsel argued that defendant had various claims that could have been raised on direct appeal but trial counsel deprived him of the opportunity to argue them by not filing an appeal and then, when there ultimately was an appeal, appellate counsel argued lack of jurisdiction rather than presenting defendant's claims. Counsel argued that trial counsel's forfeiture of defendant's claims by not commencing an appeal was not a matter of trial strategy. The State argued in rebuttal that defendant chose to absent himself from the proceedings against him in 2007, his 2009 appeal was untimely, and he should not get a "second bite at the apple" with his petition. The court granted the motion to dismiss, finding that defendant's claims did not "amount to any due process violations."

> "He cannot argue these issues in a post-conviction relief which could have been addressed
>
> on appeal and numerous of these issues are things such as trial strategy of his attorney, the

fact he was not proven guilty beyond a reasonable doubt, errors by the trial court, as well as errors in sentencing by the trial court."

This appeal followed.

¶ 81                                    III. ANALYSIS

¶ 82    Defendant contends on appeal that postconviction counsel failed to provide reasonable assistance by failing to amend the petition to include an allegation of ineffective assistance of appellate counsel to avoid default of defendant's other postconviction claims. Alternatively, defendant contends that he made a substantial showing of trial counsel's ineffectiveness for not using a peremptory strike against a biased juror.

¶ 83                            A. Postconviction Petitions

¶ 84    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a procedure for persons under criminal sentence to claim their convictions resulted from a substantial denial of their constitutional rights. *Id.* § 122-1(a). A petition under the Act must "clearly set forth the respects in which petitioner's constitutional rights were violated" and "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." *Id.* § 122-2. If the circuit court does not summarily dismiss the petition within 90 days, it shall docket the petition for further proceedings and shall appoint counsel to represent an indigent defendant who requests counsel. *Id.* §§ 122-2.1(a)-(b), 122-4.

¶ 85    The purpose of a postconviction proceedings is to allow a defendant to raise constitutional issues that were not, and could not have been, decided on direct appeal, so that issues decided on direct appeal are barred as *res judicata* and issues that could have been raised on direct appeal but were not are forfeited. *People v. Woods*, 2020 IL App (1st) 162751, ¶ 64. However, *res judicata*

and forfeiture are relaxed when fundamental fairness requires, forfeiture resulted from the ineffective assistance of appellate counsel, or the facts relating to the issue did not appear in the original appellate record. *Id.* ¶ 66.

¶ 86    A "party who fails to take an appeal, whether by careful choice, inadvertence, indigence, or as a result of fleeing the jurisdiction as here, may waive claims of error, but any right which may have existed to a post-conviction hearing on the constitutionality of imprisonment will remain undiminished." *People v. Rose*, 43 Ill. 2d 273, 279 (1969). A defendant has the constitutional right to the effective assistance of counsel and thus has a constitutional claim if counsel's performance was objectively unreasonable and prejudiced the defendant because there is a reasonable probability that the outcome would be different absent counsel's action or omission. *People v. Nicholson*, 2021 IL App (3d) 180010, ¶ 15.

¶ 87    The record on appeal from the disposition of a postconviction petition shall contain a certificate or other showing by postconviction counsel that he or she

> "has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 88    Rule 651(c) is a vehicle for ensuring that counsel provides a reasonable level of assistance in postconviction proceedings. *People v. Landa*, 2020 IL App (1st) 170851, ¶ 50. By filing a Rule 651(c) certificate, postconviction counsel may create a rebuttable presumption that he or she provided reasonable assistance, and it is the defendant's burden to overcome that presumption by

demonstrating counsel's failure to substantially comply with the duties mandated by Rule 651(c). *Id.* ¶ 46. Stated another way, when postconviction counsel filed a substantially compliant certificate, the defendant may nonetheless show that counsel failed to reasonably assist in the presentation and defense of his petition. *Id.* ¶ 56. Because substantial compliance with the rule is sufficient, counsel does not violate Rule 651(c) merely by not certifying that he or she made any necessary amendments to the *pro se* petition or that he or she concluded that no amendments were necessary to present the defendant's claims if the certificate establishes that postconviction counsel communicated with the defendant, reviewed the record and transcripts, and presented the defendant's claims. *Id.* ¶¶ 45, 47-49.

¶ 89    The State may file a motion to dismiss the petition. 725 ILCS 5/122-5 (West 2018). The court may grant the motion if the petition and its attachments fail to make a substantial showing of a constitutional violation. *People v. Parada*, 2020 IL App (1st) 161987, ¶ 17. All well-pled facts not positively rebutted by the record are accepted as true, while conclusory assertions devoid of facts and specificity are insufficient. *Id.* While a postconviction petition not supported by affidavits or other evidence is generally dismissed unless the allegations are supported by the record and uncontradicted, there is an exception for claims where the only supporting affidavit the defendant could have attached other than his or her own was counsel's affidavit. *People v. Sanabria*, 2021 IL App (1st) 190827, ¶¶ 48-49. Review of a dismissal upon the State's motion is *de novo*. *Parada*, 2020 IL App (1st) 161987, ¶ 18.

¶ 90                                B. Trials *In Absentia*

¶ 91    Section 115-4.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4.1 (West 2018)), governing trials *in absentia*, provides that,

"[w]hen a defendant who in his absence has been either convicted or sentenced or both convicted and sentenced appears before the court, he must be granted a new trial or new sentencing hearing if the defendant can establish that his failure to appear in court was both without his fault and due to circumstances beyond his control." *Id.* § 115-4.1(e).

A hearing on such a motion "must be held before any such request may be granted," at which "both the defendant and the State may present evidence." *Id.* When such a motion is denied, the defendant "may file a notice of appeal therefrom. Such notice may also include a request for review of the judgment and sentence not vacated by the trial court." *Id.* § 115-4.1(g).

¶ 92    The filing of a motion under section 115-4.1(e) is not a prerequisite for appealing a conviction *in absentia* in the same manner as any other conviction. *People v. Partee*, 125 Ill. 2d 24, 30-33 (1988). That said, under the "fugitive dismissal rule," an appellate court may dismiss an appeal brought by a fugitive defendant until and unless the defendant is returned to custody. *Sanabria*, 2021 IL App (1st) 190827, ¶ 28 (citing *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239-40 (1993)). The appellate court has discretion on whether to dismiss an appeal by a fugitive defendant. *Id.* (citing *Partee*, 125 Ill. 2d at 37). Such a dismissal is without prejudice; that is, the appeal is subject to reinstatement upon proper motion. *Id.* "[A]n appellate court has the discretionary power to refuse to hear a fugitive's appeal *unless and until* the fugitive returns to the jurisdiction." (Emphasis added.) *Partee*, 125 Ill. 2d at 37.

¶ 93                    C. Failure of Trial Counsel to Commence an Appeal

¶ 94    Both the United States Supreme Court and our supreme court have recognized that the right to effective assistance encompasses trial counsel commencing an appeal by filing a notice of appeal. *People v. Ross*, 229 Ill. 2d 255, 261 (2008) (citing *Roe v. Flores-Ortega*, 528 U.S. 470,

484 (2000)). The filing of a notice of appeal is a ministerial task, and it is professionally unreasonable to disregard specific instructions from the defendant to file a notice of appeal. *Id.* at 261-62. Prejudice may be presumed when trial counsel's ineffectiveness rendered appellate proceedings nonexistent and thus denied the defendant's right to appeal. *Id.* at 262.

> "Though the right to counsel and the right to appeal overlap, a petitioner, like Ross, who claims that defense counsel was ineffective for failing to file a notice of appeal is chiefly arguing the right to appeal was denied. The concern is the appeal itself, not necessarily its outcome. The defendant's trial may have been procedurally and substantively unassailable, but the defendant was deprived of the constitutional right to direct review of the conviction and sentence by an appellate panel. The remedy, then, should fit the wrong. A defendant whose attorney never filed a notice of appeal is entitled to that appeal, not its functional equivalent." *Id.* at 268-69.

Noting that it "declined to apply the general rule that a defendant is bound by the acts of defense counsel in cases involving appeals dismissed for want of prosecution," the supreme court in *Ross* explained that a "postconviction petition is no substitute for a direct appeal" because a postconviction petition is considered by one judge while a direct appeal is considered by three justices, a postconviction petition is limited to constitutional claims while a direct appeal is not, and appellate counsel must provide effective assistance while postconviction counsel is not so required. *Id.* at 269. The *Ross* court thus held "that when a postconviction petitioner demonstrates that defense counsel was ineffective for failing to file a notice of appeal, the trial court may allow the petitioner leave to file a late notice of appeal." *Id.* at 271.

¶ 95    Our supreme court has clarified that counsel has a constitutional

"duty to consult with a defendant about the possibility of an appeal 'when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.' " *People v. Torres*, 228 Ill. 2d 382, 396 (2008) (quoting *Flores-Ortega*, 528 U.S. at 480).

Therefore, "the constitution does not require counsel to file a notice of appeal *** unless counsel has reason to believe the defendant either actually does or rationally should want to file an appeal." *People v. Gutierrez*, 387 Ill. App. 3d 1, 6 (2008). In other words, a defendant can show ineffectiveness when he or she specifically instructed counsel to file a notice of appeal or otherwise "reasonably demonstrated that he desired to appeal" or when "a rational defendant would have wanted to file an appeal (for example, because there were nonfrivolous grounds for an appeal)." *People v. Cuevas*, 2018 IL App (2d) 151100, ¶ 25.

¶ 96    Our supreme court has also clarified that the presumption of prejudice under *Flores-Ortega* and *Ross* is modified when a *pro se* petition survives summary dismissal and counsel is appointed. Specifically, our supreme court "adopted what has been called the 'presumption of prejudice plus test' " whereby "when appellate counsel fails to perfect an appeal prejudice is presumed, but the defendant is additionally required to demonstrate that counsel's deficient performance ' "actually cause[d] the forfeiture of the defendant's appeal." ' " *Parada*, 2020 IL App (1st) 161987, ¶ 23 (quoting *People v. Edwards*, 197 Ill. 2d 239, 252 (2001)). "Under this test, it remains true that a defendant is not required to demonstrate that his appeal would have been successful in order to establish he was prejudiced by his attorney's failure to perfect the appeal." *Id.*

¶ 97    In *Parada*, this court affirmed the dismissal of a postconviction petition claiming ineffective assistance of appellate counsel for not filing a docketing statement, record, or brief in a direct appeal commenced while the petitioner was a fugitive that was then dismissed. *Id.* ¶¶ 1, 6-12. We noted in affirming the petition's dismissal that, "[w]hen petitioner's appeal was dismissed it was done so without prejudice; accordingly, his right to appeal was not foreclosed at that time." *Id.* ¶ 26. "The subsequent denial of his motion to reinstate was within the reviewing court's discretion and had nothing to do with appellate counsel's failure to file a docketing statement, record, and brief on behalf of defendant." *Id.* We therefore rejected the argument that appellate counsel's failure to perfect the defendant's appeal foreclosed him from having any opportunity for appellate review. *Id.* ¶ 31.

¶ 98    Conversely, in *Sanabria*, we reversed the summary dismissal of a petition claiming ineffective assistance of appellate counsel for not filing a record in an appeal commenced while the petitioner was a fugitive that was dismissed expressly due to the absence of a record. *Sanabria*, 2021 IL App (1st) 190827, ¶¶ 1, 6-12. Noting that the appellate court in *Parada* dismissed the direct appeal at least in part because the defendant was a fugitive while in *Sanabria* it dismissed the appeal entirely for the lack of a record (*id.* ¶ 40), we distinguished *Parada*. "Rather than conclude that the court would dismiss the appeal 'anyways,' we think due process considerations should prevail, which require, in every instance, an opportunity to be heard. Even a willfully absent defendant retains some of the procedural rights of a present defendant." *Id.* ¶ 39. We concluded:

        "that defendant has met his initial burden and that summary dismissal of the petition was

            in error. That said, it remains that, under *Edwards*, defendant must demonstrate that

counsel's performance actually caused the forfeiture of his appeal, a factual determination best suited for the trial court." *Id.* ¶ 26.

¶ 99                                    D. The Instant Case

¶ 100   Here, we find that postconviction counsel did not fail to provide reasonable assistance by not claiming direct appeal counsel's ineffectiveness. Defendant's *pro se* petition, both initially and as amended, included in its attachments his allegation that appellate counsel failed to raise substantive claims on direct appeal so that defendant did not forfeit his claims. We find that, after amendment, the allegation that appellate counsel failed to raise *all* claims in the petition included the new sentencing merger claim. Therefore, it was not unreasonable for postconviction counsel to not add an express claim of appellate counsel's ineffectiveness.

¶ 101   Moreover, this court lacked jurisdiction over defendant's untimely filed direct appeal, so that an express postconviction claim of appellate counsel's ineffectiveness would have failed for lack of prejudice. Appeal from the trial court's April 2008 sentencing was untimely whether we consider defendant's March 2009 or November 2009 notice of appeal. Ill. S. Ct. R. 606(b) (eff. July 1, 2017). Nor was the November 2009 appeal a timely appeal from the denial of a motion under section 115-4.1(e) because defendant withdrew his motion thereunder.

¶ 102   However, our analysis does not end there. Defendant also claimed, not just in the attachments to his petition to defeat forfeiture but in the body of the petition as a substantive claim, that *trial* counsel deprived him of his right to appeal by not timely filing a notice of appeal from his conviction. The record supports that claim insofar as trial counsel (private counsel at that point) did not file a notice of appeal within 30 days of defendant's sentencing or otherwise (see Ill. S. Ct. R. 606(c) (eff. July 1, 2017)) commence a direct appeal from defendant's conviction. Defendant

claimed in his petition, which we must accept as true at this stage of proceedings, that he told trial counsel that he wanted to appeal. Postconviction counsel argued, against the State's motion to dismiss arguing forfeiture, that defendant's petition raised a meritorious claim that trial counsel forfeited—or deprived defendant of his right to—a direct appeal by not commencing one.

¶ 103 As stated above (*supra* ¶ 92), and as defendant contends, an appeal from a conviction *in absentia* where the defendant is still absent may be dismissed or may proceed at the appellate court's discretion. Moreover, also as stated above, such a dismissal is without prejudice. Thus, a notice of appeal from defendant's conviction was not pointless or futile but a necessary step to preserve his ability to raise claims on direct appeal. As defendant correctly notes, the circuit court dismissed his petition as amended predominantly, if not entirely, because its claims should have been but were not raised on direct appeal.

¶ 104 Thus, accepting defendant's allegations as true at this stage, trial counsel's failure to take the most ministerial step to commence his direct appeal indeed foreclosed him from having any opportunity for appellate review, unlike *Parada* where appeal was commenced and could have been reinstated following dismissal. See *Parada*, 2020 IL App (1st) 161987, ¶ 31. We conclude that defendant made a substantial showing of a constitutional claim of ineffective assistance of trial counsel for not filing a notice of appeal from his conviction. We therefore remand for further proceedings under the Act in which defendant must show that he specifically instructed trial counsel to file a notice of appeal (as he claims in his petition), he otherwise reasonably

demonstrated that he desired to appeal, or a rational defendant would have wanted to file an appeal because there were nonfrivolous grounds for appeal. *Cuevas*, 2018 IL App (2d) 151100, ¶ 25.

¶ 105                                    IV. CONCLUSION

¶ 106    Accordingly, we vacate the judgment of the circuit court and remand for further proceedings under the Act consistent with this opinion.

¶ 107    Vacated and remanded.

---

2022 IL App (1st) 200467

---

| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 05-CR-13942; the Hon. Geraldine A. D'Souza, Judge, presiding. |
|---|---|

---

| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Emily Scout Distefano, of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|

---

| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Paul E. Wojcicki, and Amy McGowan, Assistant State's Attorneys, of counsel), for the People. |
|---|---|

---