2023 IL App (2d) 220337-U
No. 2-22-0337
Order filed May 24, 2023

NOTICE: This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05-CF-827 |
| ROBERT J. GUYTON JR., | ) ) ) | Honorable Keith A. Johnson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held:* Post-conviction counsel did not provide unreasonable assistance, and the circuit court did not err in dismissing defendant's second-stage post-conviction petition. Accordingly, defendant's appointed appellate counsel is granted leave to withdraw, and the judgment of the circuit court is affirmed.

¶ 2    Defendant, Robert J. Guyton Jr., appeals from an order of the circuit court that dismissed his post-conviction petition at the second stage. His appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks substantial merit, and on that basis, it has filed with this court a motion to withdraw as counsel (see *Pennsylvania v. Finley*, 481 U.S. 551 (1987)), along with a memorandum of law in support thereof. Defendant has

filed a response to OSAD's *Finley* motion. This court has examined OSAD's *Finley* motion, the accompanying memorandum, defendant's response thereto, and the record on appeal, and has determined that this appeal does indeed lack merit. Accordingly, OSAD is granted leave to withdraw as defendant's appellate counsel, and the order of the circuit court, dismissing defendant's second-stage post-conviction petition, is affirmed.

¶ 3                                    I. BACKGROUND

¶ 4      Following a bench trial, defendant was convicted of aggravated kidnaping (720 ILCS 5/10-2(a)(6) (West 2004)) and first-degree murder (*id.* § 9-1(a)(2)) in connection with the abduction and death of David Steeves, Jr.

¶ 5      An earlier decision recounts the evidence presented at trial. *People v. Guyton*, No. 2-07-0020 (2009) (unpublished order under Illinois Supreme Court Rule 23). We summarize the pertinent facts as follows. On April 8, 2005, at 9:09 p.m., the Elgin police received a 911 call from an individual who said he was in a car's trunk. The call terminated, and attempts to call back were unsuccessful. The 911 call originated from a phone registered to Steeves's mother. Sometime after 9 p.m., Phillip Van Heurek, who lived at 555 South Street in Elgin, saw a car pull into the driveway across the street and turn its lights off. Van Heurek then heard what he thought was a gunshot. He did not call the police. Scott Galston, who also lived nearby, thought he heard a gunshot at about 9:15 or 9:20 p.m. The next morning, police discovered a bloody shoe in a puddle of blood at 610 South Street in Elgin. There was a trail of blood leading toward the street where Galston lived.

¶ 6      An Elgin detective visited Steeves's parents' home on April 9, 2005, and was told that Steeves had not come home the night before. Steeves's parents identified their son's voice as that of the 911 caller from the night before. The detective learned from Steeves's friends that his last

known location was an apartment whose residents included Twyman Boyd and Ryan Kluender. On April 13, 2005, a .22-caliber shell casing was found near the apartment. On April 14, 2005, police discovered Steeves's car parked outside one of the buildings at the Harrison View Apartments in Rockford. His body was in the trunk. Steeves had been shot in the leg left and left side of the jaw. According to residents, the car had been there for a few days. During Steeves's autopsy, .44-caliber bullet fragments, including a bullet jacket, were recovered from his body.

¶ 7 The evidence linking defendant to Steeves's death was as follows. On April 8, 2005, defendant, Armin Henderson, and Shamekin Higgs visited Boyd and Kluender at their apartment located at 433 South Street in Elgin (South Street apartment). Boyd testified that Higgs arrived with defendant sometime between 1 and 2 p.m. Higgs brought a camouflage rifle case into the apartment and put it on the floor under the computer. Later that day, Kluender arrived at the apartment. Kluender testified that, at around 7 p.m., he called Steeves. Kluender told defendant that he planned to buy marijuana from Steeves when he came over. Kluender thought that defendant asked if he could buy marijuana, too. Kluender told defendant that he could not. Defendant left shortly thereafter. Steeves arrived about 15 minutes after Kluender spoke with defendant. Kluender bought marijuana from Steeves and asked Steeves if he wanted to smoke it with him. Steeves declined, saying that he was in a rush to meet someone. Defendant, Henderson, and Higgs were gone when Steeves left the apartment. Kluender heard no unusual noises after Steeves left. Kluender testified on cross-examination that, when interviewed by police on April 9 and 10, 2005, he did not remember or mention that defendant, Henderson, and Higgs had been at the apartment. However, when interviewed again on April 11, 2005, he said they had been.

¶ 8 Boyd testified that he heard Kluender speaking with defendant about buying marijuana. Boyd also heard defendant and Henderson talking. Boyd asked what they were talking about.

Defendant responded that he was going to "hit" Steeves. Defendant left with Henderson. Higgs stayed at the apartment another 10 or 15 minutes. On cross-examination, Boyd testified that, when interviewed by police on April 9, 2005, he said that defendant left the apartment before Steeves arrived. Boyd admitted that this was a lie and that Steeves arrived at the apartment while defendant was there. Boyd also admitted that he forgot to tell the police that Henderson was present and that it was not until a later interview on April 11, 2005, that he told police that defendant said that he was going to "hit" Steeves.

¶ 9    Lindsay Harnicker testified that, at around 8 p.m. on April 8, 2005, defendant called her and asked her to pick up him, Henderson, and Higgs at his cousin's house on South Street in Elgin. She replied that she had been sleeping. Defendant said that he would call back. Between 8 and 9 p.m., Higgs called Harnicker and asked to be picked up at a white house next to a high-rise building on Route 31 in Elgin. When Harnicker arrived, Higgs was alone, carrying an empty camouflage rifle case. They waited for defendant and Henderson to arrive. While waiting, Harnicker received several calls from Higgs's wife, Robin. She also received calls from an unknown number and passed the phone to Higgs, who answered and spoke to defendant. Ultimately, Harnicker drove Higgs to his home in Arlington Heights. Robin testified that Higgs arrived home at about 11:30 p.m.

¶ 10    Higgs testified that, on April 8, 2005, he had been at "E's" house in Elgin with defendant and Henderson before visiting the South Street apartment. He had seen defendant holding a .22-caliber rifle before they left E's house. He also saw Henderson with a handgun at E's house. A girl who was possibly named Janis[1] drove the three to the South Street apartment. Defendant

_____

[1]An affidavit from a Janice Thomas was included with the amended petition. Apparently, this is the same individual.

brought the camouflage gun case into Janis's car. Higgs was "pretty sure" that there was a weapon in the case. At defendant's direction, Higgs brought the case into the apartment. Defendant took the weapon out of the case and gave the case to Higgs. Defendant said he did not want the case anymore. Higgs later left the case in Harnicker's vehicle, and it ended up in the garbage. Defendant and Henderson left the South Street apartment before Higgs. Harnicker drove Higgs home.

¶ 11    Higgs testified that, on April 9, 2005, defendant called Higgs and asked him to bring some clothes and toiletries for him to the home of Higgs's cousin, Devon McCarthy, in Belvidere. On April 10, 2005, Higgs traveled to McCarthy's home with Robin, their children, and Harnicker. (The record indicates that defendant's brother, Shauntay, had traveled to McCarthy's home in a separate vehicle.) After they arrived, defendant and Henderson arrived. Defendant told Higgs that he and Henderson had robbed the marijuana dealer from the South Street apartment. Defendant said that the dealer did not want to give up the money, so defendant shot him in the leg. Defendant also said that he and Henderson put the dealer in the trunk of a motor vehicle. Defendant said that the dealer was shot again after Henderson heard the dealer using his phone. Defendant did not say who fired the second shot. Harnicker drove defendant and the Higgs family to the Higgs family's home in Arlington Heights. Higgs and defendant then took a train to Elgin. They stayed overnight at a woman's house. Higgs then went home.

¶ 12    The police interviewed Higgs on April 12, 2005. He told them that he had seen Steeves leave the South Street apartment on April 8, 2005. After Steeves left, defendant approached him and asked for money. Steeves refused, and defendant shot him in the leg.

¶ 13    Higgs admitted that he had prior convictions of robbery and possessing a weapon without a Firearm Owner's Identification Card. He also had a pending charge of unlawful possession of a

weapon by a felon. Higgs had an agreement with the State that he would receive a sentence of probation if he testified truthfully. He admitted that his statement to police about witnessing defendant shoot Steeves differed from his trial testimony. He also admitted that other statements during his interview with police differed from his trial testimony.

¶ 14 McCarthy testified that, at around 11 a.m. on April 9, 2005, he received a call from defendant, who asked McCarthy to pick him up in Rockford near a Walgreens drugstore on Harrison Avenue. When McCarthy arrived there, defendant was with Henderson. McCarthy dropped off defendant and Henderson at defendant's mother's residence and then went home. Later that day, defendant and Henderson went to McCarthy's home.

¶ 15 Elgin detective Daniel O'Shea testified that he and another detective interviewed Henderson[2] on April 15, 2005. At the conclusion of the interview, O'Shea asked Henderson "to turn over handguns used in the murder" of Steeves. Later, O'Shea and an officer met with Henderson, who used O'Shea's cell phone to call "an unknown person who he said was holding a firearm for him[.]" Henderson arranged to pick up the gun. Accompanied by police in an unmarked car, Henderson retrieved a .44-magnum handgun and a bag holding ammunition. Forensic testing matched that gun to the bullet jacket recovered from Steeves's body.

¶ 16 The circuit court found defendant guilty of first-degree murder and aggravated kidnaping. It indicated that it treated Higgs's testimony as if he were an accomplice, subjecting it to high-level scrutiny. Nonetheless, the circuit court found that the evidence corroborated Higgs's critical testimony. It also found that (1) either defendant or Henderson fired the weapon that fatally wounded Steeves and (2) defendant was accountable for Henderson's acts. We affirmed on direct

---

[2]Henderson was called as a witness, but after testifying that he was 26 years old and had been held in the Kane County jail for a year, he refused to testify further.

appeal, rejecting defendant's challenge to the sufficiency of the evidence to support the murder conviction. *Guyton*, slip order at 50, 59.

¶ 17    On May 25, 2010, defendant filed a *pro se* petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (2008)), seeking relief from his conviction.  The circuit court appointed counsel for defendant (see *id.* § 122-4), and, in the years that followed, a succession of attorneys represented defendant.  Ultimately, on August 4, 2021, attorney Sandra Blake filed an amended post-conviction petition, claiming: (1) trial counsel was ineffective for failing to interview potential defense witnesses and failing to "counter" the State's accountability theory; and (2) appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective.  Affidavits from Cindie Britton, Janice Thomas, Larry Giles, Shauntay Chapman, and Henderson were attached to the petition.

¶ 18    According to Britton's affidavit, defendant and Higgs came to her home on the evening of April 10, 2005.  Early the next morning, while defendant was sleeping, Britton saw Higgs with a black bag in his lap.  Later, she saw Higgs apparently trying to leave her home surreptitiously.  Higgs told Britton he was going to buy cigars.  He left the bag behind.  The bag contained bullets and money.  There appeared to be blood on the money.  Britton woke defendant and told him she wanted the bag out of her home.  Defendant appeared confused.  He tried calling Higgs, but Higgs did not answer.  Britton averred that she was not interviewed before defendant's trial.

¶ 19    Thomas's affidavit indicated that, on April 8, 2005, she drove defendant, Higgs, and Henderson to a house on South Street in Elgin.  She saw Higgs with a camouflage gun case.  She did not see defendant carrying anything.

¶ 20    Giles's affidavit indicated that, on April 10, 2005, he and defendant were at Giles's girlfriend's apartment in Rockford.  Defendant asked Giles for a ride to Elgin.  Because Giles did

not have a license, he refused. McCarthy, Henderson, and Higgs arrived later, and they agreed to meet at McCarthy's apartment.

¶ 21    Henderson's affidavit indicated that, on April 8, 2005, defendant left the South Street apartment 20 minutes before Henderson did. Higgs said that Harnicker was going to pick him up. Henderson next saw defendant and Higgs a few days later at McCarthy's home.

¶ 22    Chapman's affidavit indicated that, in April 2005, he was with defendant, Henderson, Harnicker, the Higgs family, and McCarthy at McCarthy's home. Defendant told Chapman that "they could have 'did some ill s***.' " Defendant told Chapman that he did not know exactly what had happened but had an idea and did not want to know more. Defendant expressed concern that Henderson might want to "do something" to him.

¶ 23    Almost eleven years later, on August 10, 2021, Blake filed a "Certificate of Counsel Pursuant to Illinois Supreme Court Rule 651(c) [(eff. July 1, 2017)]." On October 13, 2021, the State moved to dismiss the petition. Defendant later retained a private attorney, Jonathan Minkus, who entered his appearance for defendant on December 1, 2021. On December 6, 2021, the circuit court granted Blake leave to withdraw. It granted the motion to dismiss on August 22, 2022, and defendant filed a timely notice of appeal. The circuit court appointed OSAD to represent him.

¶ 24                                    II. ANALYSIS

¶ 25    Per *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *People v. Lee*, 251 Ill. App. 3d 63 (1993), the appellate defender moves to withdraw as counsel. In his motion, counsel states that he read the record and found no issues of arguable merit. Counsel further states that he advised defendant of his opinion. Counsel supports his motion with a memorandum of law providing a statement of facts, a list of potential issues, and arguments why those issues lack arguable merit. We advised defendant that he had 30 days to respond to the motion. Defendant has responded.

¶ 26     Counsel advises us that he considered whether to argue that the circuit court erred in dismissing the petition.  When the State moves to dismiss a post-conviction petition, the circuit court "may grant the motion if the petition and its attachments fail to make a substantial showing of a constitutional violation."  *People v. Davis*, 2022 IL App (1st) 200467, ¶ 89.  Our review is *de novo*.  *People v. Parada*, 2020 IL App (1st) 161987, ¶ 18.

¶ 27     We first consider whether the circuit court erred in dismissing defendant's claim of ineffective assistance of counsel based on the alleged failure to interview Britton, Thomas, Giles, Henderson, and Chapman.  We evaluate ineffective-assistance-of-counsel claims under the two-prong *Strickland* test.  *Strickland v. Washington*, 466 U.S. 668, 669, 688 (1984).  The *Strickland* test requires a showing that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 669. We conclude that, even if counsel had called these witnesses to testify, there is no reasonable probability that their testimony would have changed the outcome of defendant's trial.  Accordingly, defendant suffered no prejudice.

¶ 28     Britton's testimony might have implicated Higgs in the kidnaping and murder of Steeves, but it would not have refuted the evidence of defendant's involvement.  The evidence recounted above tends to establish that Steeves was shot near the South Street apartment, placed in the trunk of his vehicle, shot again a short distance away, and driven to Rockford.  Defendant and Henderson left the South Street apartment before Steeves did.  While at the South Street apartment, defendant told Boyd that he was going to "hit" Steeves.  The next morning, both defendant and Henderson were in Rockford without transportation.  Defendant and Henderson's decision to go from Rockford to McCarthy's home in Belvidere yields an inference that they were trying to avoid

apprehension in Elgin. Several days later, Henderson told police that someone "was holding a firearm for him[.]" Henderson arranged a meeting and returned with a gun, which forensic testing revealed was the gun used to shoot Steeves.

¶ 29    Although evidence implicating Higgs would bear on the credibility of his testimony against defendant, the circuit court treated Higgs's testimony as that of an accomplice and thus highly scrutinized it. Therefore, there is no reasonable probability that Britton's testimony would have altered the circuit court's assessment of Higgs's credibility. For similar reasons, there is no reasonable probability that the trial's outcome would have differed if Thomas had testified that she saw Higgs with a camouflage gun case. That testimony would have been cumulative of Boyd's testimony that she saw Higgs with the case.

¶ 30    Moreover, we fail to see what probative value Giles's testimony about the events of April 10, 2005, would have had. Also, because Henderson refused to testify, the evidence in his affidavit could not have affected the trial's outcome. Finally, the only potentially exculpatory information in Chapman's affidavit was defendant's inadmissible self-serving hearsay.

¶ 31    We next consider whether the circuit court erred in dismissing the claim that trial counsel provided ineffective assistance by failing to "counter" the State's theory that defendant was guilty under accountability principles. Despite the ineffectiveness label, the claim does not explain how counsel's performance was deficient. Rather, the thrust of the claim is that the evidence was insufficient to prove defendant's guilt under an accountability theory. However, on direct appeal, defendant raised this issue, and we decided it adversely to defendant. See *Guyton*, slip order at 49. The doctrine of *res judicata* bars defendant from relitigating the substance of the same issue in a post-conviction proceeding. See, *e.g.*, *People v. Clark*, 2023 IL 127273, ¶ 41.

¶ 32    Finally, because defendant's claims of ineffective assistance of trial counsel are meritless, appellate counsel did not render ineffective assistance by failing to raise those issues on direct appeal. See, *e.g.*, *People v. Makiel*, 358 Ill. App. 3d 102, 113 (2005) ("Unless the underlying issue has merit, a defendant cannot be considered to have suffered prejudice from appellate counsel's failure to brief that issue.").

¶ 33    In his response, defendant argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Again, because we addressed the issue on direct appeal, *res judicata* bars defendant from raising it in his petition. See *Clark*, 2023 IL 127273, ¶ 41.

¶ 34    Counsel advises us that he considered arguing that defendant received unreasonable assistance of post-conviction counsel but found that this issue lacked merit regarding both defendant's post-conviction attorneys. As to post-conviction counsel, Sandra Blake, she filed a Rule 651(c) certificate. Accordingly, OSAD considered whether the resulting presumption of reasonable assistance was rebutted where Blake omitted a claim contained in defendant's *pro se* post-conviction petition asserting that his due process rights were violated when the State failed to provide notice to him that it would be pursuing an accountability argument, despite charging him as the principal. We agree this claim lacks merit because an indictment need not specify whether the State will attempt to prove the defendant guilty as a principal or as an accessory. *People v. Bates*, 16 Ill. 2d 290, 295 (1959); *People v. Lee*, 344 Ill. App. 3d 851, 854 (2003).

¶ 35    Moreover, defendant, in his response, asserts that he did not receive reasonable assistance from his initial post-conviction counsel because the attorney who first represented him did not obtain affidavits from Henderson, Giles, Chapman, and Thomas. See *People v. Suarez*, 224 Ill. 2d 37, 42 (2007) ("The Act provides for a reasonable level of assistance."). However, the point is moot because Blake, who ultimately filed the amended petition, did obtain and append those

affidavits to the petition, although we are puzzled why it took a decade to do so. Accordingly, the presumption of reasonable assistance of counsel cannot be rebutted here where the record shows that counsel adequately performed her duties.

¶ 36     As to defendant's subsequently retained counsel, OSAD considered whether Jonathan Minkus provided reasonable assistance, where his Rule 651(c) certificate did not affirm that he made all the amendments necessary to adequately present defendant's contentions of error. Defendant argues, in his response, that Minkus failed to provide reasonable assistance because he did not attempt to obtain evidentiary support for the petition's claims and failed to shape them into an appropriate legal form.

¶ 37     The record reflects that Minkus complied with the rule. Minkus was retained by defendant and counsel stood on Blake's amended post-conviction petition. Despite being hired only to advance the proceedings, Minkus reviewed the relevant materials and was familiar with the details of the proceedings. In defendant's response, he fails to (1) identify any additional evidence, supporting his claims, that counsel failed to append, and (2) explain what he believes counsel should have done to shape his claims into an appropriate legal form. Defendant's assertions are nothing more than conclusory allegations. Therefore, defendant has failed to identify any arguably meritorious issues that could be raised in this appeal.

¶ 38                                    III. CONCLUSION

¶ 39     After examining the record, the motion to withdraw, the memorandum of law, and defendant's response, we agree with counsel that this appeal presents no issues of arguable merit. Thus, we grant the motion to withdraw, and we affirm the judgment of the circuit court of Kane County.

¶ 40     Affirmed.